AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person*<br>*by name and address)*<br><br>A red Apple iPhone with an unknown IMEI number<br>seized on November 1, 2022, and currently in the<br>custody of the DEA in Riverside, California | )<br>)<br>)<br>)<br>)<br>)     Case No. 5:22-MJ-00716 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to <u>18 U.S.C. § 3103a(b)</u>, I find that immediate notification may have an adverse result listed in <u>18 U.S.C. § 2705</u> (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     <u>November 17, 2022 at 4:57 p.m.</u>

City and state:     <u>Riverside, CA</u>

*Judge's signature*

<u>Honorable Kenly Kiya Kato, Magistrate Judge</u>
*Printed name and title*

AUSA: Mitchell Suliman (951-276-6026)

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**AFFIDAVIT**

I, Derek J. Hammerl, being duly sworn, declare and state as follows:

## I.    AFFFIANT BACKGROUND

1.    I am a Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA") and have been employed with the DEA since July 2018.  I am currently assigned to the DEA's Riverside District Office ("RDO"), Task Force Group 1 ("TFG-1"), investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.  I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered to conduct investigations and to make arrests for the offenses enumerated in Titles 18 and 21 of United States Code.  During my employment with the DEA, I have received 640 hours of narcotics law enforcement training while attending DEA Basic Agent Training at the DEA Academy, Quantico, Virginia.  Additionally, I have received 72 hours of training on money laundering and financial crimes investigations.

2.    Before joining the DEA, I was employed as a State Trooper with the Pennsylvania State Police from September 2015 to June 2018.  During my tenure as a State Trooper, I was assigned to Troop L-Reading Patrol Section, where I enforced the Commonwealth of Pennsylvania's Vehicle Code, Criminal Code, and Health and Safety Code (drug laws).  I also enforced Federal Motor Carrier Safety Regulations through the Pennsylvania State Police Motor Carrier Safety Assistance Program.  Additionally, I

have received specialized training through the U.S. Department of Homeland Security, Homeland Security Investigations in investigating hidden compartments in motor vehicles.

3.    Based on my training, conversations with other narcotics investigators, and my previous experience in the law enforcement field, I am familiar with drug traffickers' methods of operation, including the distribution, storage, transportation of drugs, the collection of drug proceeds, and methods of money laundering used to conceal the nature of the proceeds.  I have received training and have collaborated with other law enforcement officers about investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as related money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics, in violation of Titles 18 and 21 of the United States Code.

## II.  PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of an application for a warrant to search a red Apple iPhone with an unknown IMEI number belonging to Aaron Luis VILLALOBOS (the "SUBJECT DEVICE"), currently in the custody of the DEA in Riverside, California, as described more fully in Attachment A.

5.    The requested search warrant to search the SUBJECT DEVICE seeks authorization to seize evidence, fruits, or instrumentalities of a violation of 21 U.S.C. §§ 841(a)(1) and 846 (Possession with Intent to Distribute Controlled Substances

and Conspiracy) (the "Subject Offenses"), as described more fully in Attachment B.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

7.    On October 26, 2022, VILLALOBOS was indicted in the Central District of California under court case number 5:22-CR-00242 for violating 21 USC 841(a)(1), (b)(1)(A)(viii) for his attempt at distributing methamphetamine from Palm Springs, California to various locations across the United Stated via the United Parcel Service ("UPS") on August 23, 2022.  A warrant was issued for VILLALOBOS's arrest by United States Magistrate Judge Kenly Kiya Kato, Central District of California, on October 26, 2022.

8.    On November 1, 2022 at approximately 3:08 p.m., VILLALOBOS was arrested at his residence located at 53 W. 35th Street, Apt. 34, New York, New York by members of the DEA New York Field Division and DEA RDO TFG-1 pursuant to the aforementioned indictment and arrest warrant.  The SUBJECT

DEVICE was seized during VILLALOBOS' arrest and later booked into DEA custody.

9.    Subsequent to his arrest, DEA RDO TFG-1 Task Force Officer ("TFO") Joseph Cook, DEA New York Field Division SA Anthony Ferentini, and I conducted a *Mirandized* post arrest interview of VILLALOBOS at the DEA New York Field Division and learned about VILLALOBOS's narcotics co-conspirators in the Central District of California and his use of the SUBJECT DEVICE in furtherance of his drug trafficking activities.

### IV.    STATEMENT OF PROBABLE CAUSE

### A.    VILLALOBOS Attempts to Ship Methamphetamine

10.    On August 24, 2022, the Palm Springs Police Department ("PSPD") seized approximately 4.5 pounds of methamphetamine at a UPS Store located at 301 N. Palm Canyon Dr., Unit 103, Palm Springs, California.  Based on the PSPD investigative reports and conversations with TFO Cook, I learned an individual came into the UPS Store on August 23, 2022, asked the employee to further package three parcels, provided the address where the parcels were to be shipped, paid for next day shipping, and left the store.  The store employee started to prepare the parcels for shipping when he observed a suspected illegal controlled substance inside one of the opened boxes.  At the direction of the store manager, the parcels were then further examined and opened by the UPS shipping personnel prior to law enforcement being notified, which further revealed that all three parcels contained suspected narcotics.  Store employees then notified PSPD of the incident and officers arrived and seized the

suspected narcotics.  The narcotics were then booked into the
PSPD evidence locker pending further investigation and
safekeeping.

11.  On or about August 29, 2022, TFO Cook learned of the
narcotics seizure by PSPD and assumed the investigation.  Based
on TFO Cook's investigation, TFO Cook learned the shipping
labels had the same return address of Aaron VILLALOBOS, 100 W.
Tahquitz Canyon Way, Palm Springs, CA with a phone number 917-
600-6287.  TFO Cook learned the return address was the address
of the Rowan Hotel and, based on subscriber information obtained
via a DEA administrative subpoena, 917-600-6287 was subscribed
to "Aron Lobus" at the time.

12.  DEA RDO TFG-1 Task Force Agent Ryan Tidd was able to
locate a photograph of VILLALOBOS based on the phone number 917-
600-6287.  TFO Cook went to the UPS Store and reviewed video
surveillance of the individual attempting to ship the narcotics.
After reviewing the surveillance video, TFO Cook was able to
positively identify the individual shipping the narcotics as
VILLALOBOS.  TFO Cook then went to the Rowan Hotel and met with
the front office manager.  TFO Cook showed the manager a photo
of VILLALOBOS from the surveillance video, the manager
identified the photo as being Aaron VILLALOBOS and stated that
VILLALOBOS checked out of the hotel on August 25, 2022 but has
been there several times in the past.

13.  On September 6, 2022, TFO Cook took custody of the
suspected narcotics seized by PSPD on August 24, 2022, processed
them into DEA evidence and sent them to the DEA Southwest

Laboratory for analysis and safekeeping.  On September 26, 2022, TFO Cook received a chemical analysis report authored by Senior Forensic Chemist Jonathan Park which identified methamphetamine in all units received and reported the net weight of the methamphetamine was 2375g +/- 1g with a substance purity of 94% ± 6%.

**B.   VILLALOBOS's Indictment in the Central District of California and his Subsequent Arrest in New York, NY**

14.   On October 26, 2022, VILLALOBOS was indicted in the Central District of California under court case number 5:22-CR-00242 for violating 21 USC 841(a)(1), (b)(1)(A)(viii) for attempting to distribute the methamphetamine seized on August 24, 2022 by PSPD.  On October 26, 2022, United States Magistrate Judge Kenly Kiya Kato, Central District of California, issued an arrest warrant for VILLALOBOS.

15.   On November 1, 2022 at approximately 3:08 p.m., VILLALOBOS was arrested at his residence located at 53 W. 35th Street, Apt. 34, New York, New York by members of the DEA New York Field Division T-23 and DEA Riverside District Office Task Force Group 1 pursuant to the aforementioned indictment and arrest warrant.  During the arrest, agents seized the SUBJECT DEVICE which was located on VILLALOBOS's bed in VILLALOBOS's room at his residence.  Also, VILLALOBOS confirmed with agents at the time of his arrest the SUBJECT DEVICE was his cellular device.

### C.    Post Arrest Interview of VILLALOBOS

16.   On November 1, 2022 and subsequent to VILLALOBOS's arrest, case agents transported VILLALOBOS to the DEA New York Field Division office for processing.  On the same date and at approximately 4:30 p.m., case agents conducted an interview of VILLALOBOS.  VILLALOBOS was *Mirandized*, signed a DEA-13 Advice of Rights form, and initially said he did not want to answer questions.  Moments later, without prompting by the agents, VILLALOBOS asked the agents what they wanted to know and then agreed to answer questions.  In summary, VILLALOBOS stated the following:

a.   Prior to coming to California, VILLALOBOS stated several individuals provided him money to purchase methamphetamine for them and these individuals instructed VILLALOBOS to travel to Southern California because that is where the methamphetamine suppliers are located.  VILLALOBOS said he arrived in California on approximately August 20, 2022, a male who he knows as Daniel picked him up at the San Diego International Airport and drove him to an unknown location where Daniel picked up several boxes.  VILLALOBOS said he did not see inside the boxes but suspected that the boxes contained methamphetamine.  Daniel then drove him to the Kimpton Rowan Palm Springs Hotel in Palm Springs, California.  Daniel instructed VILLALOBOS to take the boxes and told VILLALOBOS that Jobie GROSS ("GROSS") would come by the hotel and pick them up at a later date.  VILLALOBOS took the boxes that Daniel picked up and checked into the hotel.

7

b.   VILLALOBOS said GROSS came by the hotel (VILLALOBOS could not remember the date and time) and picked up the boxes. VILLALOBOS said GROSS was supposed to pay VILLALOBOS but never did.  Case agents showed VILLALOBOS a California Driver's License photograph of GROSS, and VILLALOBOS positively identified him as GROSS.  VILLALOBOS said GROSS lives in Palm Desert, California and lives with another male that he knows as "Michael."  Case agents showed VILLALOBOS a California Driver's License photograph of Mikel LUECK ("LUECK") and VILLALOBOS confirmed that individual was "Michael."  VILLALOBOS said GROSS and LUECK live together but operate independent illegal drug trafficking organizations ("DTO").  VILLALOBOS stated he believes GROSS and Daniel are co-conspirators and Daniel also is associated with someone VILLALOBOS knows as Angel.  VILLALOBOS said the Angel and Daniel DTO operates in Orange County, California.  VILLALOBOS said the LUECK DTO is in the Coachella Valley area of California and LUECK is being sourced narcotics by Doroteo CASTRO ("CASTRO") who resides in Indio, California.

c.   Case agents showed VILLALOBOS a California Driver's License photograph of CASTRO, and VILLALOBOS confirmed that was the same person who he knows as CASTRO.  VILLALOBOS also said that CASTRO lives with Michelle LAPLANTE ("LAPLANTE") and LAPLANTE works with the CASTRO DTO.  VILLALOBOS said CASTRO can source distribution quantities of methamphetamine and has driven to CASTRO's residence in Indio, California with LUECK previously to pick up several ounces of methamphetamine.  VILLALOBOS said CASTRO will also possess distribution quantities of fentanyl.

8

VILLALOBOS said CASTRO drives a black vehicle, possibly a Corolla, when he (CASTRO) conducts narcotics related business. VILLALOBOS stated CASTRO has a storage unit within five minutes of CASTRO's residence where he has "1,000 pounds of meth" in the storage unit.  VILLALOBOS said CASTRO sells VILLALOBOS methamphetamine for between $1,300 to $1,500 a pound.

   d.   Case agents showed VILLALOBOS a California Driver's License photograph of LAPLANTE, and VILLALOBOS positively identified that person as LAPLANTE.  VILLALOBOS said both CASTRO and GROSS will always have a weapon on their person when they are involved in a narcotics transaction.  VILLALOBOS stated both CASTRO and GROSS will make it a point to show the weapon to VILLALOBOS when VILLALOBOS is with either of them.

   e.   VILLALOBOS admitted to taking several boxes to the Palm Springs UPS store on August 23, 2022.  VILLALOBOS later confirmed that he knew the boxes contained methamphetamine and that the shipments were for the individuals who provided VILLALOBOS with money before he arrived in California. VILLALOBOS said the parcels never were delivered, and that he received threats from those individuals who provided him money.

   f.   VILLALOBOS reiterated that he deals with two different DTOs from California when he is in California to pick up narcotics: 1) Angel, Daniel, and GROSS who are operating from Orange County, California and Palm Desert, California; and 2) LUECK, CASTRO, and LAPLANTE who are operating from Indio, California and Palm Desert, California.  During the interview, I asked VILLALOBOS if the SUBJECT DEVICE was his to which he

replied it was.  VILLALOBOS signed a DEA-88 Consent to Search
form for the SUBJECT DEVICE and provided case agents telephone
numbers for Angel LNU, Daniel LNU, GROSS, LUECK, and CASTRO
which were stored in the SUBJECT DEVICE.  VILLALOBOS also stated
he would communicate with his co-conspirators with his cellular
device primarily via WhatsApp.  VILLALOBOS also stated GROSS
stores narcotics at his address and that he (VILLALOBOS) stored
GROSS's address in the SUBJECT DEVICE under his (VILLALOBOS's)
photos.

     g.   Agents concluded the interview with VILLALOBOS at
approximately 6:15 p.m.

### V.   <u>TRAINING AND EXPERIENCE CONCERNING USE OF CELLULAR TELEPHONES BY DRUG TRAFFICKERS</u>

     17.   I know from training and experience in the field of
narcotics, as well as conversations with other narcotics
investigators, that individuals involved in the crimes of sales
and transportation of controlled substances often utilize
cellular telephones to communicate or coordinate with their
associates and co-conspirators.  I am also aware that drug
traffickers often change cellular telephones or alternate the
use of several cellular telephones to avoid detection by law
enforcement.  In my experience, drug traffickers also often use
cellular telephones and residential telephones that are not
subscribed in their own names to avoid detection by law
enforcement.  Furthermore, with rapidly evolving technology,
drug traffickers are now utilizing the dark web and web-based
applications to communicate, such as WhatsApp, Signal, GroupMe,

and Facebook Messenger.  I also know that cellular telephones commonly contain evidence of drug trafficking via text messages and applications and contain information on DTO members, associates, drug customers, and suppliers.

18.  I also know from training and experience that cellular telephones also often contain location information concerning where the phone has been located, and where certain files on the phone, such as digital photographs, were created.  This type of information is often useful for associating a phone's user with a location, and in conjunction with other information, can establish the location of drug storage locations, meeting locations for co-conspirators, and whether or not the phone was present at different times and locations when conduct relevant to the investigation occurred.

19.  Considering the facts detailed above regarding VILLALOBOS's arrest and VILLALOBOS's *Mirandized* post arrest interview, based on my training and experience, I believe it is probable the SUBJECT DEVICE could have been used in furtherance of his drug trafficking activities and could contain evidence further supporting the same.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

20.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

21.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

11

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.   Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.   Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.   That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.   For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

12

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VII. <u>CONCLUSION</u>

23.  For all the reasons described above, there is probable cause to believe that evidence of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT DEVICE, as further described above and in Attachment A of this affidavit.

Attested to by the applicant in accordance with the requirements of <u>Fed. R. Crim. P. 4.1</u> by telephone on this 17th day of November, 2022.

_____
HONORABLE KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE

i

## **ATTACHMENT A**

DEVICE TO BE SEARCHED

    A red Apple iPhone with an unknown IMEI number belonging to Aaron Luis VILLALOBOS (the "SUBJECT DEVICE"), seized on November 1, 2022, in New York, New York, and now in the custody of the DEA in Riverside, California.



## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 846 (the "Subject Offenses"), namely:

a.   Records of all text messages, Short Message Service ("SMS"), Multi-Media Messaging Service ("MMS"), and any other text or messages sent or received through web-based messaging applications, such as WhatsApp, FaceBook Messenger, Signal, GroupMe, KIK, etc., sent or received from the SUBJECT DEVICE concerning controlled substances and/or money, assets or payment.

b.   Records of all email communications sent or received from the SUBJECT DEVICE concerning controlled substances and/or money, assets or payment.

c.   Records of Global Positioning System ("GPS") coordinates and other information or records identifying location information of the SUBJECT DEVICE or files on the SUBJECT DEVICE to include information containing travel routes, destinations, origination points, and other locations.

d.   Photographs or videos of individuals, documents and other records, places, and things relating to controlled substances and/or money, payments, assets, or other forms of financial information.

e.   Address book and other contact information, including stored and saved names, addresses, telephone numbers,

iii

email addresses, I.P addresses, and websites associated with controlled substances, money, assets and/or transfers of funds.

g.   f.   Call log information, including all telephone numbers dialed from the SUBJECT DEVICE, as well as all received/incoming or missed calls.

g.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

h.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

iv

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.   SEARCH PROCEDURE FOR THE SUBJECT DEVICE

3.   In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK"

vi

(Forensic Tool Kit), which tools may use hashing and other
sophisticated techniques.

       e.  The search team will not seize contraband or
evidence relating to other crimes outside the scope of the items
to be seized without first obtaining a further warrant to search
for and seize such contraband or evidence.

       f.  If the search determines that a SUBJECT DEVICE
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the SUBJECT DEVICE and delete or destroy all forensic copies
thereof.

       g.  If the search determines that a SUBJECT DEVICE
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

       h.  If the search determines that the SUBJECT DEVICE
is (1) itself an item to be seized and/or (2) contains data
falling within the list of other items to be seized, the
government may retain the digital device and any forensic copies
of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

       i.  The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.